# Staunton.

Womack v. Paxton's Ex'or & Als.

84   9
f109  228

September, 1887.

1. Principal and Surety—*Trust deed—Alteration of terms—Case at bar.*—Trust deed to secure bonds whereon W. was surety, prescribed sale of trust property upon default for cash. Creditor and trustee obtained decree altering terms of sale from cash to credit, W. being party to suit and not objecting.

Held:

    W. was not discharged as surety by the alteration.

2. Idem—*Security—Incident.*—Contract of principal and surety is that the debt shall be paid. Trust deed to secure the debt is a mere incident—a mere security for enforcing the debts. Alteration in terms of sale is no alteration of contract.

3. Idem—*Exhaustion of principal.*—It is error to subject surety's land before proper efforts are made to subject principal's to satisfy the judgment. *Horton* v. *Bond,* 28 Gratt. 815.

4. Judicial Sales—*Commissions—Extra allowances.*—Where but a part of price is ever collected, commissions should be allowed only on the part collected, and no extra compensation is allowable for extraordinary efforts to sell the land. Code 1873, ch. 174, § 6.

Appeal from decree of circuit court of Botetourt county, rendered June 18, 1885, in the chancery cause wherein W. A. Glasgow, executor of James Paxton, deceased, and trustee of John L. Circle, &c., was complainant, and John L. Circle, Charles Circle, Sarah A. Circle, Oliver Shirkey, and William W. Womack were defendants. From this decree the said Womack obtained an appeal and *supersedeas.* Opinion states the case.

*G. W.* and *L. C. Hansbrough,* for the appellant.

1. This court, in *Dey* v. *Martin,* 78 Va., 1, said: "It is well settled that any change in the contract, made without the surety's consent, however immaterial, and even for his advantage, discharges him."

Brandt on suretyship, § 345, says: "Any dealings by creditor with principal, which amounts to a departure from the contract, discharges the surety."

And in § 338, same writer, says: "No principle of law is better settled at this day than that the undertaking of the surety, being one of *strictissimi juris,* he cannot at law or in equity, be bound farther, or otherwise, than by the very terms of his contract.  *  *  *  Neither is it of any consequence that the alteration of the contract is trivial, nor that it is for the advantage of the surety. '*Non hæc in fœdera veni*' is an answer in the mouth of the surety, from which the obligee can never extricate his case, however innocently, or by whatever kind intentions to all parties, he may have been actuated."

FOR EXAMPLE: "A, for B's accommodation, indorsed B's note to C. It was agreed between all the parties, at the time, that B should give C a mortgage upon his stock of goods as a security for the debt, and this was done as agreed. C failed to record the mortgage, and at the end of three months canceled it and took another. Held, A was entirely discharged, notwithstanding it was affirmatively proved that the mortgage, if duly recorded and uncanceled, would have been no protection to the surety by reason of older liens; and this was so held on the ground that the contract had been altered without the surety's consent." Brandt, § 338.

"Surety is discharged by non-compliance with the terms upon which he signed. A guarantor for goods to be sold on a credit of 18 months is not liable if the sale is made on a credit of 12 months." Brandt, § 361.

The application of these principles to Womack's case is easy

and plain. Recur to the history of the case: Womack was surety on 24 bonds executed by John L. Circle to Glasgow, executor of James Paxton, deceased. These bonds were secured by trust deed executed the day of the date of the bonds on the "Fork's Farm" to Glasgow, trustee, to secure Glasgow, obligee of the bonds. The trust deed provided that in case of default of payment of the bonds the "Fork Farm" should be sold for cash enough to pay the expenses of the sale and the amount due and unpaid, and for new bonds, with approved security, to meet the old bonds as they fell due. Glasgow, executor, obligee and trustee, apprehensive that on the terms of sale prescribed by the trust deed, "Fork's Farm" would not sell for enough to pay the balance due or unpaid, brought his suit, and expressly asked the court to decree a sale on *different* terms from those prescribed in the trust deed. This the court had no right to decree. But this the court did do in violation of the law. *Wood* v. *Krebbs*, 33 Gratt., 685.

Now, was this not a palpable alteration of the contract into which the said Womack had entered as such surety, and did not that alteration wholly discharge him?

The contract between Glasgow, as executor of Paxton, with John L. Circle, was not merely that the latter should pay the former the amount of the said purchase money and should execute his bonds with the appellant as surety for the said amount. It was much more. It was that Glasgow as such executor, should sell and convey to said John L. Circle the Fork farm for a stipulated price; that the purchaser should give the vendor his 24 bonds with the appellant as surety; and that he should also execute a deed conveying the said farm back to Glasgow as trustee, in order to secure the payment of the said bonds. These three acts constituted but one transaction. They could all have been embodied in one writing. But to constitute the three acts one transaction, it was not necessary to embody them in a single writing. There were three writings. Each formed a part of the contract. All of them

make but one agreement. The deed of conveyance, the bonds
for the price, and the trust deed, were all then executed simul-
taneously. Each was dependent on the other two. Had the
land not been conveyed *bona fide* with a good title, the bonds
could not have been collected either by the enforcement of the
trust deed or otherwise. Had the trust deed not been executed
the land would not have been conveyed, and the appellant
would not have signed the bonds as surety. The three writings,
all parts of the contract of sale, having the same origin, con-
sideration and object, made then one and the same transaction
and agreement. Glasgow and Circle were the only parties to
the deed of conveyance. And these two were the only par-
ties to the trust deed. And though the appellant was not *nomi-
nally* a party to either of the said instruments, yet *beneficially* he
was a party to both. Because, had the title failed, he would not
have been compelled to pay the bonds. And in equity under
the well settled doctrine of subrogation, he was entitled to the
full benefit of the trust deed to the extent to which the bonds
might be paid out of his funds as such surety. He is as much
interested in that trust deed as if he had himself executed it,
and was the maker thereof himself; and this under the said
equitable doctrine is undeniable.

Mr. Bishop in his new work on "Contracts," states the ele-
mentary doctrine as follows: "§165. *Separate writings*—on one
piece of paper, or on several attached pieces, or on separate
papers referring to one another, or *relating to the same subject,*
whether made simultaneously or on different occasions and
days, may be regarded as one contract." * * * And in
§382, he repeats the same in effect and refers among numerous
other authorities, to the decision of this honorable court in
*Byrd v. Ludlow,* 77 Va., 483. See also Chitty on contracts,
(11 Am. Ed.), 146, 147.

What matters it also that the creditor in his bill alleged that
his purpose was to pray the circuit court to alter the terms
of sale, and that such alteration was necessary? Such was

equally true in *Wood* v. *Krebbs,* where the trust deed terms of sale were " Cash," and where the court was asked by the creditor to do a thing which it was unauthorized to do. The advantage, or the necessity for such alteration, is wholly beside the question and does affect the answer.

It is true, Womack was a party to the suit, and did not object to the decree as entered. It was not his business or his interest to make such objection. He had only to stand by and allow the executor, obligee and trustee to make the alteration of the contract and thus unloose the noose of suretyship by which he (Womack) was bound. On the effect of surety's silence at such a time, see Brandt on suretyship, near the close of § 370.

In *Woods* v. *Krebbs,* as reported, *supra,* it does not appear that Wood objected to the entering of the decree for the sale of the land on terms other than those prescribed in the trust deed, though after the decree had been entered, and the term was ended, prior to any sale under the decree, Wood did petition for a rehearing of the cause and a reversal of decree on account of the departure.

Womack did not and does not object to the sale on the altered terms if the creditor desired it; but, nevertheless, he is entitled to the benefit of the alteration which discharged him as surety for the debt due the creditor.

2. But even if Womack was not entirely discharged as surety by this palpable alteration of his contract of suretyship, he was at least discharged and released from the burden of that contract to the full extent of the net proceeds of the sale of "Fork's Farm," which was made under that decree of the court at the instance of Glasgow, executor, creditor, obligee and trustee, and commissioner selling "Fork Farm" under that decree, though part of those proceeds was uncollected through no fault, certainly, of Womack.

On 24th October, 1871, under that decree, "Fork's Farm" was sold at public auction to the same John L. Circle for the

sum of $14,000—whereof he paid $1,400, and gave for the residue, $12,600, his three bonds each for $4,200, with six sureties— *but Womack was not one of those sureties.* The obligors in those three bonds were the same as those in the twenty-four bonds originally given, except Belle Circle, Isaac Reynolds and James B. Davis, who took the places of Oliver Shirkey and Womack. Default was made in payment of these three bonds. And the same Glasgow, executor, creditor, trustee, and commissioner of sale, and receiver, asked the court to order a re-sale of "Fork's Farm"; and the court did order it at his instance; and he was again made commissioner to sell, and did again sell "Fork's Farm" for $10,600. This time the purchaser was *William E. Walkup,* and not Wm. W. Womack, as appellees' counsel says. But credit was allowed on the debt wherefor Womack, as surety, was bound, *only* for the net proceeds of the last sale for $10,600, and *not* for the net proceeds of the sale for the $14,000, as should have been allowed. To the report of Commissioner W. B. Simmons thus reporting this matter, Womack excepted, and insisted on the court's adopting the alternative report made by the commissioner at the instance of Womack. But the circuit court confirmed the general report, and rejected the alternative report which gave credit on said debt for the net proceeds of the sale for $14,000.

Brandt, in his work already quoted from, in chapters XVII and XVIII, treats of principles which are pointedly apposite to the case of the appellant, Womack. In chapter XVII, § 370, he says: "The surety is entitled, upon paying the debt, to subrogation to all the securities which the creditor may at any time have acquired for the payment thereof; and it results as a corollary from this proposition, that if this right is rendered unavailing by the act of the creditor, the surety is *pro tanto* discharged."

It is here he says that *the silence of the surety,* when he knows that the creditor is doing this act, will not prevent his discharge, *as he is not called upon to speak.*

And in chapter XVIII he treats of the discharge of the surety when by any act of the creditor the security for the debt is lost or impaired in value, and declares, on page 522, that there is no solid distinction between the release of securities by the direct act of the creditor and his allowing the securities to be lost or impaired by want of ordinary care; and he gives many instances illustrative of the rule.

And so it equally is where, as in the case at bar, the creditor causes the court to take upon itself the administration of the property which has been conveyed in trust to secure the debt whereon the surety is bound, and by any act of the court during the progress of the administration of the trust property, the same is lost or impaired in value, the surety is discharged to the extent to which the security is rendered unavailing to pay the debt. Glasgow had sold "Fork's Farm" to John L. Circle and taken his bonds for the purchase-money, with sureties—one of whom was Womack. Contemporaneously John L. Circle conveyed the land to Glasgow, as trustee, to secure the payment of the bonds to Glasgow, the obligee and executor. Glasgow chose to pursue the trust property, which was intended to secure not only himself, but also the sureties. He caused the court to proceed to administer the trust property, and procured a decree for a sale on terms different from those prescribed by the trust deed, which is the contract of suretyship. As commissioner he makes sale on those altered terms, taking bonds with sureties approved by him; reports the sale to the court, which ·approved it and the bonds taken by him. The land brings $14,000, which sum, less the expenses of the sale, should be applied at once as a credit on the debt to pay which the sale was made, which was the debt for which Womack was surety. There is again a default in the payment of the purchase-money, but not a default of Womack, who was not a surety therefor. Glasgow then asks for a re-sale; obtains decree therefor, and as commissioner he makes the sale for $10,600, which sale is reported and confirmed, and the money,

when collected, is applied, less the costs and expenses, including commissions, to the said debt. The loss of the difference between the sale at $14,000 and the sale at $10,600 is made *to fall on Womack*, he proving to be the only solvent obligor on the original bonds. He should not be required to bear this loss. The sale at $14,000 was a *conversion* of the trust-subject into that much money by the court *at the instance* of Glasgow; and Womack is entitled to the full benefit of the entire sum, after deducting the proper expenses. Womack did not cause the sale to be made. It was not his business to object to the proceedings. He had no control whatever over any part thereof. If the creditor was about to release him by selling on different terms from those prescribed in the trust deed, or was selling at $14,000, and thereby entitling him to a diminution of his liability to that extent, the commissioner and court alone had to approve the bonds, and they were presumed to know and to do what was suitable to the occasion. "In such case he was not called upon to speak." Brandt, § 370.

But the circuit court by its decree rejecting the alternative statement by the master in his report, made Womack surety for the second purchase by John L. Circle; made Womack guarantor of the performance of the *new contract*, which, at the instance of the creditor, the court had formed with John L. Circle and his new batch of sureties. This was obviously and palpably wrong and unjust.

But it will be contended that neither the creditor, trustee, commissioner of sales, nor the court has been proved to have been guilty of any negligence whereby the full price—$14,000— was not collected. Please note the fact that this is perhaps an anomalous case of a judicial sale of trust property, in which the creditor, who is the trustee, takes of his own accord the trust into a court of chancery to be there administered. He asks for a decree of sale of property which he, as such trustee, is competent to make *in pais*. The decree he asked for is a decree for the resale of the property, the purchase money

whereof is coming to him from the original purchaser, John L. Circle, one of whose sureties the appellant is. He is appointed sale commissioner and is required to take good and approved personal security for the deferred payments. He makes sale to the *same* purchaser, John L. Circle, who had been in *gross default* for nearly six years in paying the much larger portion of the original purchase money; and he took as sureties the same persons (except the appellant), who were the original sureties, with the addition of Isaac Reynolds and James B. Davis. In addition to the fact that the principal and his original sureties had been in default for the said period, the record shows that there was realized by the sale of their entire real estate only the sum of $2,956 06, whilst from the two last named sureties nothing was realized, the record indicating that they were insolvent when they executed the bonds. Of course, there was a default in the payment of the bonds. The appellant was in no respects responsible for said default. At the instance of the creditor, the court had taken upon itself the administration of the trust—had made a *new contract* with the *same purchaser* for the sale of the trust subject, with which the appellant had no concern. He had no more to do with the collection of the bonds for the deferred payments than he had to do with the $1,400 which had been paid cash.

Suppose the $14,000 had been collected and paid into court, and the depository had defaulted and the money had been lost; or, suppose sheriff under *fifa* sells principal's goods for enough to pay the debt and fails to pay over the money; or, suppose sheriff, who usually sells goods of debtor under process for cash, should be ordered to sell on credit, as is sometimes the case, and the sales equal the debt, but the money is never collected—in all these cases is not the surety discharged? And if so, why is not Womack in this case entitled to credit on his obligation for the full net proceeds of the sale made under the decree of the court below at the instance of the creditor?

In conclusion, we respectfully insist (1) that Womack was

wholly discharged by Glasgow's procuring a decree for a sale of the trust property on terms other than those prescribed. in the trust deed; and if not that, then (2) that he is entitled to have this obligation diminished by the full net proceeds of the sale for $14,000, whether collected or not.

We also respectfully insist that the decree complained of is erroneous, and should be reversed on account of the errors set forth in the assignments in the petition, which are designated as II, III, IV, V, VI, and VIII, and which involve the allowance of fees to Glasgow as attorney for Glasgow, executor, obligee, and trustee, out of the funds of the defendants, which should have gone to diminish the debt for which the appellant is bound as surety; also full commissions on the whole $14,000 which was uncollected and the $10,600 which was collected, and extra allowances as sales commissioner out of the said funds of the defendants, and the sale of the lands of the principal debtor and of all the sureties but one (Oliver Shirkey) *at one blast,* in defiance of the rule laid down in *Horton* v. *Bond,* 28 Gratt. 815, which assignments can be best comprehended by reference to the said petition and to the record.

*F. T. Glasgow,* for the appellee.

HINTON, J., delivered the opinion of the court.

The facts and proceedings necessary to be stated in order to a clear apprehension of the questions to be decided in this cause, are these:

On the 15th day of November, 1866, W. A. Glasgow and J. G. Paxton, executors of James Paxton, deceased, pursuant to the will of their testator, sold a tract of land of 404¼ acres, lying in the counties of Botetourt and Alleghany, at the confluence of the Jackson and Cowpasture rivers, and known as the "Forks Farm," to John L. Circle, at the price of $22,025 00. The purchaser complied with the terms of sale by paying ten

per cent. of the purchase-money in cash, and giving his bonds for the deferred payments with Charles S. Circle, Margaret Circle, Sarah A. Circle, Oliver Shirkey, and, the appellant, Wm. M. Womack, as sureties. For the purpose of facilitating a distribution of the estate, each deferred payment was divided into twenty-four bonds; and to secure the payment of all of these bonds, a deed conveying the land to the purchaser and a deed of trust conveying the land from him to said Glasgow, as trustee, were simultaneously executed and recorded. Of these bonds, many have been transferred, under a decree in another suit, by the surviving executor to the distributees of said Paxton in satisfaction of their respective interests in the estate.

The purchaser, Circle, being in default in the payment of some of the deferred instalments of purchase-money, the trustee, Glasgow, made an effort to re-sell the land pursuant to the terms of the deed of trust, which proved abortive. He then filed his bill in equity, in which, after reciting this fact and the terms of the deed of trust, he says: That he has reason to believe that no person could be found who would pay the large amount then due, in cash, and provide for the payments yet to fall due conformably to the terms prescribed in the trust deed; that he fears that the trust subject may fail to make good the balance due on it, and that he may be compelled to go against the sureties; and he then prays, amongst other things, that the court would "direct him in the execution of his trust and make such alteration and modification in the terms of sale as will most certainly insure a fair price for the property," &c. To this bill, Circle and his sureties were made defendants.

On the 22d March, 1871, the court entered a decree modifying the terms of sale prescribed in the deed of trust, recognizing the trustee, Glasgow, as its commissioner, and directing him to sell the land as a whole or in parcels, as he thought best, for ten per cent. in cash, and the balance in three equal annual instalments, with interest from the day of sale. Under this decree, Glasgow, trustee and commissioner, sold the prop-

erty on the 30th May, 1871, to Wm. E. Walkup, for $13,750 00, but this sale, at the instance of Circle, the court refused to confirm: whereupon, the commissioner, acting under the same decree, sold the land on the 24th October, 1871, to the same Circle, who was also the original purchaser, for the sum of $14,000, whereof $1,400 was paid in cash, and this is all that was ever collected of this purchase-money. For the deferred payments, Circle, the purchaser, gave his bonds with Isaac Reynold, James Davis, Belle Circle, and the same Charles S., Sarah A., and Margaret Circle as sureties.

On the 12th September, 1872, the court, on the application of the said John L. Circle, allowed him an abatement of $2,034 03, with interest from 15th November, 1866, on his purchase money for a deficiency in the quantity of bottom land.

On the 7th April, 1873, the purchaser, John L. Circle, being in default in paying the purchase money of the sale made to him on the 24th October, 1871, a decree was entered directing a resale. Under this decree the land was sold on the 10th November, 1873, to the appellant, William M. Womack, for the sum of $10,600, and by him was turned over to William E. Walkup upon terms which the record does not disclose. Thereupon the commissioner to whom the cause had been referred to take an account of the balances due on the bonds of the 15th November, 1866, having in the meanwhile reported that about $7,000 would remain unpaid thereon after deducting all credits, said Glasgow filed an amended and supplemental bill, in which, after setting forth the facts that judgment had been obtained upon the first bond given at the sale made on the 24th October, 1871, and that execution had issued thereon and been returned "no property found," &c., and that this large balance of $7,000 would remain after the proceeds of the last sale were applied to the payment of what was due under the first sale, to be charged on property other than the "Forks Farm," he prays that such proceedings may be had against all

of the sureties to the first and second sales who were defendants to the bill as might ensure payment of the balances that may remain of the debts set up in the said original bill. And on the 23d April, 1877, the court entered a decree recommitting the cause to a commissioner to ascertain and report the balances remaining of those debts after deducting all proper credits and providing for the application thereto of all other funds, properly applicable thereto, but which may not have been yet applied, so that it may appear for what amount decree should be taken against the lands of said Womack. On the 18th June, 1885, the court, pursuant to the finding of its commissioner, decreed that unless Womack should within sixty days from 5th June, 1885, pay off the balances remaining on these debts, which aggregated the sum of $5,407 90, as of June 12, 1885, and which were liens upon his land, that those lands should be sold and the proceeds applied to that purpose. And it is from this decree that Womack has appealed, and the first and great error which he assigns is that the action of the court in ordering a sale of "Forks Farm," in the decree of February 3, 1872, upon terms differing from the terms of sale prescribed by the deed of trust, entirely discharged him as surety for the debt secured by that deed, or if it did not entirely discharge and release him from the burden of the contract, " that it did at least discharge him " to the full extent of the net proceeds of the sale of "Forks Farm," made under that decree, though part of those proceeds were never collected. In other words, his contention is, to use the language of the brief, that although he did not and does not object to the sale on the altered terms if the creditor desired it, nevertheless he is entitled to the benefit of the alteration, the effect of which is to discharge him entirely, or at least to the extent of the net proceeds of the sale of "Forks Farm," made on the 24th October, 1872.

But, after a careful consideration of the subject, we can discover no foundation either in the principles of law applicable

to the contract of suretyship or in reason to justify either of these pretensions. It is undoubtedly well settled that the undertaking of a surety being one *strictissimi juris*, he cannot, either at law or in equity, be bound farther or otherwise than by the very terms of his contract. And this rule, as was said by Kent, C. J., in *Ludlow* v. *Simond*, 2 Caines Cas. in Error, 1, is founded upon the most cogent and salutary principles of public policy and justice. In the complicated transactions of civil life, the aid of one friend to another in the character of surety or bail, becomes requisite at every step. Without these constant acts of mutual kindness and assistance, the course of business and commerce would be prodigiously impeded and disturbed. It becomes, then, excessively important to have the rule established that a surety is never to be implicated beyond his specific agreement. Accordingly it has become almost axiomatic that whenever the principal debtor and the creditor enter into any agreement, without the consent of the surety, which varies essentially the terms of the contract or materially affects the rights and remedies of the surety, the surety is thereby released. But it is also well settled that the surety will not be discharged by the lawful act of the creditor or by the decrees of the court which the creditor cannot control. "The act of the creditor which injures the surety, or increases his risk or exposes him to greater liability, which will operate as a discharge, must be in the doing of something which the law prohibits or in the omission to do something which the law requires. But, in this case, it was the duty of the surety to see that the debt was paid either by his principal or himself. The contract of the surety, as well as of the principal, was, that the debt should be paid; and to this contract the deed of trust was a mere incident—a mere security for the enforcement of the debt. And the contract cannot be said to be in any proper sense altered or varied by the mere alteration in the terms of sale of this security. The surety has in no way been deprived of the full benefit of his security, but on the contrary, and as

the consequence of his own conduct in failing to pay upon the default of his principal, has had the security sold upon better terms than those prescribed by the deed of trust, and as a further consequence has had the benefit of the proceeds of sales, which in all probability could not have been effected without this alteration of the terms of sales. The surety therefore, and not the creditors or the executor, must be regarded as responsible for the sale and the necessary change of terms. But apart from all this, the surety must be held to have waived any right which he might have had to complain of the alteration in the terms of sale from those prescribed in the deed of trust, if the objection had been made in time. The bill fully disclosed the fact that one of the principal objects, which its framer had in view was to bring to the attention of the surety, who was made a defendant, along with others, that he thought a change of terms was absolutely necessary in order to a sale. Then was the time for the appellant to have made his objection, if he had any, and by failing to do so he has forfeited that right. For whatever may be the rule between man and man, when a surety is called upon in a court of justice to answer, he must make his objection then or stand forever concluded.

Upon the second branch of this objection it is necessary to say but little. As we have seen, the appellant is a surety to the bond for $22,025 00, and as we have further seen, that he was not discharged by the change of the terms of sale, it follows that he can only be discharged from his engagement, which is that, in the default of his principal to pay, that he will pay the whole of the debt. That engagement, except to the extent that the debt has been already extinguished by actual payments, and the abatement for the error in giving the number of acres of bottom land, still exists, and cannot be blotted out by charging the court or its commissioner with laches and negligence in failing to realize the whole purchase

money upon the second sale to Circle, for the charge is wholly unsustained by proof.

This disposes of the first assignment of error.

The next assignment of error we shall notice, is the action of the court in allowing W. A. Glasgow, the commissioner, commissions upon the whole $14,000, for which the "Fork Farm" was sold at the first judicial sale, when only $1,400 thereof was ever collected, and its action also in allowing the same commissioner two sums, one of $50, and the other of $100 as extra compensation for his extraordinary efforts to sell this land. This objection is well taken, for however meritorious may have been the claims of the commissioner, we are concluded in this respect by the express terms of the statute which provides that for services of commissioners, or officers under any decree or order for a sale, including the collection and paying over the proceeds, there shall not be allowed any greater commission than five per centum on the first three hundred dollars *received by them,* and two per centum on all above that, and if a sale be made by one commissioner or officer, and the proceeds collected by another, or not collected at all, "the court under whose decree or order they acted shall apportion the commission between them as may be just." Code 1873, ch. 174, § 6. As to the expenses for advertising, crier's fee, and surveying the land, they were all properly allowed. *Hogan* v. *Duke*, 20 Gratt. 244.

The next assignment of error which we shall notice, and it is the only other assignment which is well taken, is that the lands of the appellant, Womack, should not have been charged with the judgment of Scott & Co. v. Bradley & Womack until proper efforts had first been made to subject the property of the principal debtor. This was clearly against the rule laid down in *Horton* v. *Bond*, 28 Gratt. 815; and is therefore erroneous.

For the errors indicated above the decree must be reversed,

and the cause be remanded to the circuit court with instructions to render a decree in conformity with the views herein expressed.

DECREE REVERSED.